Good morning. Before we begin our work for today, we have what is a very pleasurable experience for us. And for that purpose, I will recognize our former colleague and dear friend, Judge Arthur Gallarza. Good morning. May it please the Court. Today I have the privilege of requesting the admission of Robert Gerard Gallarza to the Bar of the Federal Circuit. I have known his credentials for a number of years. He is a member in good standing of the highest court in Maryland. I would move his admission to the membership of the Federal Circuit Bar. I'm sure he will be a valuable addition to that bar. Thank you. Thank you. I will just say also that notwithstanding that Robert has had the great advantage of standing on the shoulders of giants, his parents, Melanie and Art, and his clerkship with me was sandwiched between two very other important clerkships, one with our dear friend Kent Jordan from the Third Circuit, and now for my great colleague, Judge Chen, I want you all to know that I plan to take credit entirely for all of Robert's success in his future. I am absolutely confident that there will be enormous success because he's not only just such a great individual and pleasure to have around and to work with, but he has quite an extraordinary love and respect for the law that you don't see, unfortunately, all that often among lawyers or law clerks. And I've benefited enormously from his expertise and really been driven and impressed by his, as I said, his respect for the law and his caring about the origins and the context of legal principles and not just simple application of those principles. So I would enthusiastically agree to the motion, and I'll turn to Judge Chen for other remarks. Thank you, Judge Prost. I also second the motion. I've had the great opportunity to get to know Robert Gallarza well. I would have to say he's ranked among the top four clerks I've ever had, easily, comfortably. But I also would say that over these past few months, I've gotten to know Robert's intellect, skill set, character, work ethic, and I have no doubt that he will make a most excellent addition to our bar. And yes, he'll always be your former clerk, Judge Prost, but I think of him not only as a Gallarza and a member of the House of Prost, but now also a member of the House of Chen. Since Robert never clerked for me, I really think I'm probably the only judge on the court. I can't really add anything to this other than his reputation among the other chambers is a sterling reputation. And I did promise my colleagues I would not say anything about his father. Thank you, Judge Blank. Well, thank you. The motion is granted, and if Robert will stand for the oath. Welcome to the bar. Congratulations. Thank you. Nice to have you back, Judge Niarsen. Well argued. Yes, well argued. All right. Our first case for argument this morning is 13-1306, Bristol Myers v. Telloff. Mr. Lee. Thank you, Your Honor. May it please the Court, my name is Bill Lee, and together with my partner, Amy Wigmore, I represent Bristol Myers Squibb. As the Court knows, this case involves the invention by scientists at BMS of a chemical compound, Intekvir, a life-saving treatment for patients suffering from hepatitis B. At the time of the invention, worldwide estimates suggested that hepatitis B was, and I quote, the most important chronic viral infection affecting humans. Yet at the time, there was no FDA-approved treatment for hepatitis B. First of all, how do you pronounce it? Because I've been unable to be sure. I pronounce it Intekvir. Intekvir. I've never been called to task by BMS, so I think it's correct. Well, with regard to Intekvir, I'm just trying to understand your position. And is it your position that because there was a finding of unexpected properties, then that finding mandates that we conclude that there was no reasonable expectation of success? No, that is the manner in which Teva has characterized our argument, and we are not advocating for a broad blanket rule. Our position is this, Your Honor. Our position is that the district court made several legal errors in reaching the decision that he reached. They involved the unexpected properties, and if I could identify three, and hopefully that will answer your question. The three most critical legal errors, as opposed to factual errors, are these. The district court premised its decision on an obvious-to-try analysis out of KSR. But in reaching that decision, he made three subsidiary legal errors. First, KSR requires that there be a finite number of alternatives. Even by his own analysis, there were scores and scores of alternatives. KSR requires that obvious-to-try be applied in a predictable science. And the experts agree that nucleoside analogs are an unpredictable science. And the third, that relates a little bit to what you just described, is his definition of the reasonable expectation of success. And I would draw the Court's opinion to A127, where he says the reasonable expectation of success is a reasonable expectation to get properties similar to the prior art. But that, in fact, is not the reasonable expectation of success that this Court has articulated. You have required a reasonable expectation of succeeding in achieving the claimed invention. So that's legal error number one that we'd like to address. Legal error number two is... And that doesn't get into the notion of how effective the drug was in terms of potency, et cetera, for hepatitis B, right? Your Honor, if I take cyclobenzatrine footnote seven and say they're all part of the same obviousness analysis... Yeah, but having said that, it's clear, and I didn't think you were sort of taking issue with the fact that the judge analytically citing cyclobenzatrine said, first we're going to do a prima facie case, here's the inquiry for that, and then we look to, before we reach an ultimate conclusion of obviousness, we look to the secondary consideration. That's the right analysis, right? Your Honor, I think after cyclobenzatrine, if I drew the Court's attention to footnote seven, basically what it says is, in a district court trial where the patent is issued by the patent office and has the benefit of the presumption of validity, you take all the evidence in and then you reach a decision... Before you reach the ultimate conclusion of obviousness. But in this case, and in scores of other of our opinions, we've analyzed certain factors with regard to the prima facie case, and then, before we turn to the ultimate conclusion of obviousness, we turn to the secondary or so-called objective condition, right? Yeah, I would say two things, Your Honor. I think the Court's decision in cyclobenzatrine addresses precisely this, that there have been some panel decisions that have applied the prima facie case analysis that the patent office applies. There have been some that have said, no, you just put it all together. In this case, it doesn't matter for this reason. If we take the three areas that I'd like to focus on, obvious to try, which does have the reasonable expectation of success component, when the district court respectfully erred in saying that, I find no reasonable expectation of success because I'm comparing it to two-prime CDG. Well, the reasonable expectation of success is in achieving the claimed invention, not the prior art. And, in fact, when the Court considers A127, you'll see that what he cites is the Osaka decision, and the portion he cites is addressing the reason to modify, the motivation to modify, not the reasonable expectation of success. So having made that the analytical framework, he then had to confront his own findings that this compound had extraordinary potency, an extraordinary therapeutic window, and it had extraordinary genetic resistance. Those were his findings, and the question was, how can you reconcile them with the reasonable expectation of success? And he did it three ways, and, again, respectfully, he erred legally three times, and here are the reasons why. The first time he said, they really weren't unexpected because I'm going to look at what the inventors expected, and they told me that they expected some of these unexpected properties. That's the wrong analytical framework. He then said, I'll also compare it to Tenofovir, and it doesn't have unexpected properties by comparison, but Tenofovir was not the prior art that was used for the obvious analysis. I know, but just on that small point, I don't want to get distracted, but your friend points out, and there is record evidence, that that was sort of a forced error, that that was something that was raised by your client, and the judge was responding to that. It is, Your Honor. Let me just respond to it in 10 seconds. They actually raised it, and our expert was responding. In fact, they raised it in the pretrial memo. They raised it with their expert affirmatively. Our expert was responding to it. But I think, however it was raised, it's not the closest prior art. But then the third part of this analysis, because having found no reasonable expectation of success, but having done it by comparing the invention to the prior art, which is not the correct analysis, the court then has to say, well, what am I going to do with these unexpected results? And the key, Your Honor, is at page A153. And in A153, what the district court did is this, and it's something that this court has never done, and this court has never blessed. It said, I'm going to take the objective considerations, and some are good and some are bad, and I'm going to say they're mixed, and I balance them against each other. And then he says, I find that BMS did not strongly persuade the court as to Entechevier's non-obviousness. There are two legal problems with this. The first problem is that you don't balance the objective considerations. Mr. Lee, what if we read the district court opinion and say we find some of the proffered secondary consideration evidence to be valuable and compelling, and then we find some of the other proffered secondary consideration evidence to be not particularly compelling? And if we understand the opinion that way, would you say that was legal error to think about the evidence in that particular manner? Your Honor, the manner in which you've articulated it would not be legal error. The question then becomes, what conclusion do you draw from that? And it's a legal conclusion. But the district court did more than just that. The district court did three things. The first thing the district court did is it said, I have these unexpected results, but I'm going to in part dismiss or diminish them because the inventors would have expected it. Because what? The inventors would have expected it. If the court considers the district court's analysis on unexpected results, you will see that there are three pages where he says, well, they really weren't that unexpected because the inventors said they expected something like this. But it's the person of ordinary skill in the art whose expectations are important. Isn't it true, though, that at bottom, the district court judge did credit this patented compound of having unexpected properties, the high genetic barrier to resistance, the high therapeutic window, and the high potency? He made those express findings. He gave that credit in the analysis. Your Honor, I would... I may have mentioned the other tenovier and then looking at the inventors' expectations, but regardless of all that, he ultimately did find that there were unexpected properties. Your Honor, I agree, and that's critical because he ultimately found that there were unexpected properties. As we've said, we can find no case from this court involving a new chemical entity as opposed to a formulation patent or a dosing patent where a property with extraordinary potency, an extraordinary therapeutic window, high barrier to genetic resistance, those undisputed properties has been found obvious. Now, the question, Your Honor... The reason I said I agree with the first part is the second part. The question is, what do you then do with that? Because as a legal matter, you can't reconcile that with the finding of reasonable expectation of success. Well, that was my first question, though, that are you saying as a matter of law once you conclude that there is some degree of unexpected results that, as a matter of law, dislodges or contradicts or obviates anything about the reasonable expectation of success? The answer is, Your Honor, I would not advocate for a rule that was that broad. What we're saying is this. When you take Judge Chin's three findings of unexpected results, which are not disputed by either party, and then you layer that on top of an analysis, going back to your question of reasonable expectation of success, where the comparison made by the district court was not to the claimed invention, but to the prior arc. And you then layer upon that the fact that the manner in which, and this goes to the second half of Judge Chin's question, the manner in having made those findings, the question then becomes what use did the judge make of them in reaching his determination? And I think that the fact that he diminished them maybe is the best word, by using the inventor's expectations, the fact that he referred to Sanofibeer, but most importantly, if a court focuses on this sentence today, 153, BMS, quote, did not strongly persuade the court as to Antecobeer's non-obviousness. Actually, I'm looking at 153, and you mentioned that before, and I didn't really see the sentence. Top of last sentence, first paragraph, the totality of that evidence does not strongly persuade the court as to Antecobeer's non-obviousness. So we don't have that burden here, Hunter. The burden is clear and convincing evidence. It's their burden. And what the district court did... But he knows that. He said that many times, including in the following paragraph, where he said Teva has demonstrated by clear and convincing evidence. I mean, there's very little to call out in this opinion that suggests that he misplaced the burden of persuasion, the ultimate burdens in this case, put them in the wrong place. Your Honor, let me say this, and then I'll reserve my rebuttal time. I think the opinion's long. The opinion's in part long because the district court went through six different steps, each of which had multiple different decision-making points, and ultimately reached an obvious-to-try analysis. There are portions... Going back to Your Honor's comment on cyclobenzetrine, there are places where he cites cyclobenzetrine for a proposition, but there are portions where he deals with the issues before him without acknowledging what that decision had said. The key for us here is this. One of the reasons that this court has existed is to give us a coherent body of patent law. In the new chemical entity field over the last quarter century, the court has articulated a set of principles that have given some certainty, some guidance, and predictability to the field. An opinion that has inconsistencies with it, and I think this is at least an inconsistency, but an opinion that has inconsistencies but more importantly says, in a context where you can have literally scores of decisions, that can be obvious-to-try. In a context where the reasonable expectation of success is a comparison to the prior art, not to the claimed invention, where the claimed invention actually has unexpected results, which are diminished on a legally insignificant basis, the district court should at least reconsider under the proper legal standards. Louis Tom, I think... Can I ask you a question? No, that's why I wanted you to not sit down. Okay. I won't. I'm going to save your time. The problem I'm having, Mr. Lee, with your argument is this. How exactly the trial court dealt with these secondary considerations? Did he weigh them against each other to subtract one from the other, or did he, as Judge Chen argues, suggests, maybe didn't do that, maybe we could read differently. We have a general principle that says we don't judge opinion, we judge the judgment, the conclusion. So one could look at all of that debate and you point out correctly that he looked at prior art instead of the claim. That's sort of a factual error because what he's dealing with there are facts. So we may say his factual conclusion on that point is clear error, but ultimately you point out that our job is to look at his conclusions, and you're right, but his conclusions we look at without deference if I understand the peculiar obviousness law that we have. So all of that, it seems to me, doesn't really destroy the trial judge's position because ultimately what we have to do is look at the facts of the case, the facts that he found, determine whether any of them were clearly erroneous, and if they were, discard them, or if there are enough of them, we've got to send it back, but if there aren't enough of them, we then come to our independent conclusion, don't we? Your Honor, let me say three things if I could take the time to answer it. The first is the narrowest of the three. On the objective considerations, he described them at A152 as mixed. That's not part of the analysis under the court's Medtronic decision, but that's the narrowest of the decisions. The second point is this. I actually think, Your Honor, that the focus on appeal and the focus we've tried to give the court is less on the facts that were found and more on the legal principles that have been applied, and I've tried to focus on that this morning because I think ultimately, and I agree with you, the question of what's fact and what's not, obviously this is ultimately a legal conclusion. We've all been asked on multiple occasions precisely what that means, and the honest answer is... Unfortunately, we all agree we don't know. We don't know, right. So I'm actually trying to identify a set of legal principles that we can consider against that backdrop, and if you think about these, and it's a long opinion, but if I give you just these... Yeah, he's got 171 pages. Right, and I think that's actually part of... It reads like a novel. That's part of the issue. If you think about his analysis on structural similarity at A97 to 102 as a starting point for a legal compound, if you think about the unexpected results, and he did make those findings, but then he diminished them in a legally incorrect way, and then if you think about obvious to try, and even if you think that finite and predictable are questions of fact, there still is the fact that he applied the wrong legal standard in his comparison. We suggest, as you know, that if the correct legal standards were applied, this would be a non-obvious invention. At a minimum, the correct legal standards should apply. If the court were just to consider this question, if this opinion stood as valid precedent and in the manner in which you should evaluate a new chemical entity compound... Why would you call it precedent if we adopted it? It would create some confusion. We don't know. It wouldn't be precedent unless we adopted it. Isn't that right? It would not be precedent unless you adopted it, but if you affirmed the legal analysis, which is, I think, the right focus here, it would be a problem. And I'll reserve... Well, I don't have any time left. We'll restore a couple minutes for rebuttal. Mr. Lombardi. May it please the Court, George Lombardi on behalf of Teva Pharmaceuticals. Mr. Lombardi, let me ask just an initial question. What is the status of your ANDA? The status of our ANDA is not of record, Your Honor. I would actually have to ask a question to make sure I answered that accurately, but I can get that answer for you before the close of the argument. Okay. Well, let me cut you off then and ask you to respond to one of Mr. Lee's latter points, which is the way the judge analyzed this case. It diminished the unexpected results in a legally incorrect way. What is your response to that comment? Not surprisingly, Your Honor, it did not diminish the results in a legally incorrect way. What the judge did below was consider the objective indicia evidence, which is what he should have done. I think when counsel says that he diminished them, what he really means is that the judge didn't accept those as proving, as establishing evidence that this was not an obvious invention at the time the invention was made, which is the purpose of the objective indicia analysis. Here the court did that properly, considered all the objective indicia, considered it as a totality of the evidence, considered it in the context of all of the evidence of obviousness, which is exactly what the precedent of this court calls for it to do. What did he mean when he used the word mix? When he talked about some evidence being great, some evidence being not helpful, and therefore the evidence as a whole being mixed, was he comparing them off against each other and then diluting what could have been arguably the strong evidence? No, Your Honor. I think what the judge was doing, and he does it in the section I think that's titled Summary, and he was summarizing the overall character of the evidence. And in summarizing the overall character of the evidence, that was an accurate statement. Bristol Myers presented some evidence of objective indicia, which the court ruled wasn't really evidence of objective indicia. The court concluded that other evidence that was presented did provide some support for being an objective indicia of non-obviousness. That was a descriptor of what his overall analysis had been, but it's very clear, as I believe Judge Prost pointed out earlier in the opinion, this judge was very aware of the standard that is to be applied, stated it correctly numerous times, and never stated it incorrectly. And so when the court came to objective indicia, it knew what the standard was. At the end, it did summarize what his overall findings were and how that fit into his obviousness conclusion, but that was an appropriate statement of the law. I should say, to go directly to one of the points counsel made here, Your Honor, in terms of the Tanofovir point, just because we're talking about the record, Your Honor, we did not raise Tanofovir. That was invited error by Bristol-Myers. What happened was that at a pretrial conference, our expert couldn't make it at a scheduled time, and so it was agreed that our expert would actually go first. That's the only reason our expert addressed the point concerning Tanofovir first, and that is in the record at a 9-28-2012 pretrial conference. Let me just shift gears a little, and now let's go back to the Prima facie case of obviousness and leave unexpected results for a moment. At first, I recoiled a little when Mr. Lee's brief suggested that we were going to use the thoroughness of the district court's 170-page opinion against him, but he's on to something, is he not? I mean, one of the reasons you describe this as such a thorough, lacy opinion is because this was quite an extensively detailed analysis of the Prima facie case of obviousness, right? Because it's unusual with respect to this compound. He had to go through so many stages in the analysis, and that's a bit unusual, is it not? Well, here's how that happened. I mean, he had to do it, but that's because the nature of your case to establish obviousness was predicated on this multiple-layer analysis, which is somewhat more complicated than your normal run-of-the-mill case. I would say it was not so much the nature of our cases, it was the nature of Bristol-Myers' case, because Bristol-Myers came in and said, to get to the point of obviousness here, you have to go through six or seven steps to get there. Yeah, but we're all clear, it's not their burden. They have no burden on the ultimate question of obviousness. That's all you. Absolutely, it's us. But, Judge, what I'm saying is, the court addressed every contention they made about the steps. Really, the prior art cuts through all of those steps because there are really two pieces of prior art that are important here. Two-prime CDG, which was the lead compound, which had never been disclosed to the Patent Office. So this court was the first entity to consider whether a patent should issue in light of two-prime CDG. And the second thing was the Madovan reference. So there were really two prior art references that cut through all of those seven steps. Now, did we and did the judge go through all those seven steps to rebut what the contentions were by BMS? Absolutely, we did. We did that out of a sake of thoroughness and wanting to address every point, and we did. And if you go through each of those seven, you will find that there is nothing about those that indicates... Just to clarify, are you saying that you and the district court went through all those multiple decision points on rebuttal? I would think that you would need to do that in your initial analysis to establish a prima facie case of obviousness. Which one of the decision points, or of the multiple decision points, needed to be discarded in the first instance, in your view? Well, it didn't need to be. If I give the impression it needed to be discarded, Your Honour, I'm misstating. Were they all necessary, in your view? They are necessary. But some of them have been skipped. That's what I want to know. No, nothing's been skipped. No, but you were saying it was wrong to characterize it as seven decision points, and so I'm trying to figure out, well, which of the ones were unnecessary? Well, here's what I'm saying, Your Honour, is you knew, based on the prior art, based on 2' CDG, for instance, that carbocyclic rings were... I'm sorry, I just need to know. Do you agree that all six or seven decision points were a necessary part of the prima facie case of analysis? They are a necessary... Yes, they're a necessary... Yes, okay. Yes, yes. And with this additional comment, Your Honour, they are subsumed within the consideration of 2' CDG and Modavon. So those two references already made many of the decisions that were made with respect to the seven different elements that we just spoke about. But, yes, all of those are dealt with. I'm just saying that a shorter... The prior art had already dealt with many of them in selecting 2' CDG as a lead compound, and in the Modavon reference, which talked about the substitution that was necessary. Let's go through the... Just for the moment, think about those six or seven steps. Let's assume that for each of those steps there was a high probability of success, maybe 75%. If you do the math, if I understand it correctly, the likelihood of success of six steps with 75% success in each one, you have an overall likelihood of success that's quite low. Well, that would not be the case under these facts, Your Honour, and that's because, as I was referring to with Judge Chen, 2' CDG occupies a number of those steps. We knew at the time of the invention, the art knew at the time of the invention, that 2' CDG was a lead compound that had very great activity against viruses. That made it a lead compound here. The probability of success in getting another compound based on a one-atom modification of 2' CDG were very high. And so when you look at 2' CDG and all the art related to 2' CDG, and the District Court lays this out in extraordinary detail, went through everything that everybody on each side talked about and sorted through it, you come to the conclusion that 2' CDG was a lead compound, had promising properties, and was precisely the type of compound that you would expect a modification to would make for a more active compound. You add to that the Madovan compound, the other reference that we talked about. Madovan talked about the specific alteration, the one-atom alteration, and showed that when you make that one-atom alteration, you make a significant change in activity. So really, the reasonable expectation of success, Your Honor, is very clear in this case, and it's based on all those steps as compressed into 2' CDG and Madovan, as I've been discussing. Moving back, I know we're shuffling you back and forth from one issue to the other, but going back to unexpected results, is it your view that this fails or these are not significant enough because there's just not enough of a difference in degree between what was disclosed in the specification and the ultimate differences, let's say, on potency and so forth? That is certainly part of it, Your Honor. The precedent of this court makes clear that a difference in degree is not sufficient for unexpected results. A difference in kind is, but a difference... There are various cases, and what they say is in the context of their cases, but I'm not sure I'm exactly clear that there can't be a substantial enough difference in degree where, I don't know, where you cross the line between kind and degree. Do you understand what I'm saying? There could be significant differences in degree that ultimately get you into the box that we might call kind, right? Understood, Your Honor, and I agree with you. There is no firm line that you can take out of the case because the cases are different and you have to look at them on their facts, so that is clearly true. Our position and what the district court found on unexpected results and all of the objective indicia was to consider those objective indicia for the purpose you're supposed to consider them, which is ultimately, was this compound obvious at the time of the invention? Was the motivation to make the compound real, as the Allergan case stated, for instance? And these unexpected results, in particular, didn't cast any doubt on whether the motivation was real at the time of the invention. But do you disagree that the cases would support an analysis that says you don't just look at the time of the invention, the unexpected results that are relevant can arise afterwards? Oh, I absolutely don't disagree with that. That is absolutely correct, and the district court did consider that evidence, did consider the evidence that arose after the time of the invention. But what the district court did was consider it for the purpose you are to consider objective indicia, which is ultimately to determine whether at the time of the invention there was a motivation and a reasonable expectation of success. And at the time of the invention, the district court found that the motivation was real. Two-prime CDG was a compound that was being touted in the art. Madovan pointed to the one atom change that had been successful with other nucleosides in increasing the potency. It was expected that you would get a compound that would have improved antiviral effect. But everything you're talking about is the Prima Facie case. And then, you know, assuming that's established, and I realize we're talking about things in terms of Prima Facie and objective evidence, and as a two-stage inquiry, and maybe that's not the most accurate way to put it, but for purposes of this argument, it helps organize everyone's thoughts. Then you have to get to the secondary consideration of it. And that's what we're having some trouble figuring out to what degree do... What's your best case for showing us that there are facts similar to these facts where the unexpected results just weren't good enough? Allergan. In the Allergan case, there was a situation where there were claims to a formulation, and there were unexpected results that specifically related to something called an afternoon trough. And those were unexpected results, and this court accepted the fact that those were unexpected results. But the court said, despite those unexpected results, that was not enough, not enough to raise a question as to whether the motivation to make the compound in the first instance was real, and found the patent obvious. There are other cases, Judge, which we talk about in the briefs. We talk about the Dillon case, an en banc case that goes back. It cites cases like In re Maude and In re Mahillion, I think is how you pronounce it, Judge, which are also instances where there are findings that there are unexpected results, but you still have a finding of obviousness. And this is that case. This is what the judge did in this case. He did the findings on the prima facie cases, as your honors point out. He then considered all of the objective indicia. And the question with the objective indicia is not just whether there's an objective indicia there that you have evidence of. It's not a checkbox. You just don't check the box and conclude that you have a finding of non-obviousness. What you have to do is determine whether those objective indicia have an impact on the conclusion at the time of the invention, and whether there was a reasonable expectation and a motivation at the time of the invention. And when you look at the objective indicia in this case, all of them, and in particular, the unexpected results, the conclusion is that that's not enough to cast doubt on the fact that at the time of the invention, there was no hindsight. At the time of the invention, there was a reasonable expectation. I'm just curious. Did anybody else come up with this? I know in the late 80s, this was regarded as something of a hotbed of an area of research, and then I guess it's your position that it seemed like it was only a matter of time before someone was playing around with the five position and put an extra carbon with a double bond. I mean, did anybody else post-1990 come up with this? I realize VMS were the ones that patented it. That's right. No, nobody did, Your Honor, but what did happen prior to... There's a window of time between the time of the invention and the time this was made known to the public that VMS had this compound which short, and so there wasn't a lot of time there, but in the intervening time, there were people working with 2'-CDG and making modifications to 2'-CDG. Other of the modifications that we said were obvious and were predictable. They hadn't gotten to this particular modification, but people were working with the compound and working with other modifications. Mr. Lombardi, a sidebar with the court's permission. On my drive in this morning, I heard a radio program, extensive discussion from NIH or HHS, I'm not sure which, about the explosion of liver cancer and liver problems that they are now dealing with because of hepatitis B and the work that's being done on new drugs. That reinforces Mr. Lee's earlier point that this is a major medical problem in the country and the cost of treating all these people in later years apparently a lot of people back in the 80s exposed themselves through needles in one thing or another and that's now coming out. Do you have any information or that you could just background information on what any of these new drugs, are they in the pipeline somewhere? Are they coming? What's happening?  I can tell you, Your Honor, and this was in the record in the case, that there are other compounds that have been successful in treating hepatitis B. In fact, there is a competitor to Entecavir called Tenofovir, which you've heard about in this argument, that I believe, at least as of the time of the trial, was a bigger presence in the market, very close, but bigger presence than Entecavir. So there are other compounds out there and historically I think what happened here, Your Honor, was that during the 80s the work was being done that ultimately led to, I think the word explosion was used during the trial, an explosion of compounds that were used to develop hepatitis B and this is one of those compounds. The court considered exactly the points you're talking about, considered the commercial success points and considered them in a nuanced way. It didn't just check off the box that this had been commercially successful. It clearly has in a colloquial way, but the question is, does that commercial success change the analysis, change your view as to what happened at the time of the invention? And it does not in this instance. Thank you. I mentioned this, colleagues, to make full disclosure that I heard an outside discussion of this case. I didn't get the radio turned off in time, but I don't think it influences my view. We're probably listening to NPR around 6.50 a.m. That's my guess. Exactly, you're probably right. Yeah, that's about right. Thank you, Your Honor. Thank you. All right, why don't we restore four minutes of rebuttal. Mr. Lee, when did this patent expire? 2015. February. February? No PTA or patent term extension? That's with it. That's with it. Okay. Going to someone who knows better than me. 2015? 2015, yeah. Let me make four points briefly, hopefully within my rebuttal time. I'm sorry, can I ask you a hypothetical? Sure. To me, the pivot point of this case is trying to figure out what to do when you have some properties that might have been expected. Let's just assume for a moment that 2-CDG was the lead compound and that there are reasons to play around with it, maybe even on the sugar ring, not the base, and there was some expectation of antiviral properties, but maybe not particular properties like this high genetic barrier to resistance. So there's a reasonable expectation of certain good properties, but it was unexpected that you would get additional properties. Does the discovery of the unexpected properties all of a sudden negate the expectation and perhaps motivation to make the modification to the lead compound? Where's the law on that, and then why is the law that way? There are two parts to the answer. The first part goes to your last question of where the law is, and it's a point I tried to make in the opening argument. The requirement is that you identify a reasonable expectation of success of the claimed invention. If the district court had actually correctly used that analysis, then you wouldn't find the inconsistency we're finding between the unexpected results and the reasonable expectation of success. I'm asking you to assume for this question that there was a reasonable expectation that you would get some good properties against herpes. But maybe it wasn't expected that you would have high genetic barrier to a resistance for hepatitis B. So now what do we do? Your Honor, I think if that had been the analysis... So on one score, yes, there's a reason to make this claimed compound, because there was an expectation that you would get something good and valuable out of it. But you didn't know that you were going to get something extra. You were going to get an extra boost out of it. Your Honor, again, two parts to the answer. And the first is just the caveat that that's not what the district court did. But let me answer the hypothetical. I think in that particular situation, that's, at least in my view, why Psychobendotrin says you've got to wait until you look at the whole collective evidence on whether something's obvious or not. Because if you went step by step, you might conclude, well, it was obvious at one point in time, and then it became non-obvious later, which the court has never said is the right analysis. When you look at that collective body of evidence, which is what the court has done, whether you go prime the patient case or not, it's the collective body of evidence. And in the circumstance you're describing, you could have an antiviral that was toxicly as crazy. I mean, there have been lots of cancer treatments that are promising cancer treatments, and you find out they kill every cell in your body. That's why the question of whether something is toxic or not or has a therapeutic window or not is key. Mr. Lombardi said, you know, it's one atom difference. Well, the 2'-CDG and in tech care have one difference. One is toxic. One is therapeutic. One can treat hepatitis B. One cannot. That's why I think the best answer we can give you is if you look at the collection of the evidence, and that's what Genetics Institute tells us to do, and you apply the right reasonable expectation of success on these facts, as the facts are undisputed, as you and I talked about on the unexpected results, you couldn't find this to be non-obvious. Now, the other points, very quickly, are, to answer your question, 2'-CDG was identified in 1984. If this was so simple as to just go to Madivan, what happened in the intervening 6 years? Point number 2, there are multiple steps in the analysis, and Mr. Lombardi is skipping steps 1, 3, 4, and 5. Each of those has an immense number of choices. What the district court did is it started with structural similarity, and then it went out to a very full academically researched body of art and found, at each step, something that would send them in the right direction. And at the end, even with all that, he got to obvious to try, which I've addressed before, and Madivan. And if the court looks at Madivan at page A2003, which they rely upon, the compound, compound 3, that suggests change, the very next sentence, it says, it's toxic. And the very next sentence says, actually, if you add a fluorine instead, you have something just as potent and not toxic. That is the problem with the analysis. Just one final. Again, the problem is, to go to Judge Plager's question, are the legal standards that were applied, including unexpected results, not subsidiary facts? And we suggest that if the right standards had been applied, the result would have been different. Thank you. Your Honor, on Judge Chen's question, the ANDA has tentative approval. Has what? Tentative approval from the FDA. Thank you. Thanks, both sides, and the case is submitted.